## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                          No. CR 07-2443 JB

DANIEL TARANGO,

       Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Sealed Motion to Reduce Sentence, filed February 26, 2015 (Doc. 220)("Motion"). The Court held a hearing on August 26, 2015. The primary issues are: (i) whether the Court may reduce the 92-month sentence it imposed on Defendant Daniel Tarango in 2012 because of a subsequent, retroactive reduction in the applicable United States Sentencing Guidelines ("Guidelines") when it made errors in calculating the Guidelines range in Tarango's favor; and (ii) whether it should reduce this sentence in light of the factors set forth in Section 3553(a). The Court concludes that it may reduce the sentence, because 18 U.S.C. § 3582(c)(2) and U.S.S.G. § 1B1.10 constrain its ability to revisit its original sentencing errors and Tarango is otherwise eligible for the reduction. While the Court respects the new changes to the Guidelines, it has reservations about their retroactive application after it spent so much time sentencing Tarango in 2012. Given Tarango's post-sentencing conduct and Plaintiff United States of America's non-opposition, and given that the retroactive reduction expresses the political will of the Executive Branch, the United States Congress, and the United States Sentencing Commission, the Court finds it appropriate to reduce

his sentence. The Court will thus grant the Motion and sentence Tarango to 73-months' incarceration.

## FACTUAL BACKGROUND

The Court takes its facts from: (i) the Presentence Investigation Report ("PSR"), disclosed June 8, 2010; (ii) the Plea Agreement, filed December 18, 2009 (Doc. 145)("Plea Agreement"); (iii) the United States' Sentencing Memorandum and Motion for Departure Pursuant to [REDACTED]/18 U.S.C. § 3553(e), filed January 5, 2012 (Doc. 195)("Sentencing Memorandum"); (iv) the Amended Response to Defendant Daniel Tarango's Amended Sealed Motion to Reduce Sentence, filed August 25, 2015 (Doc. 227)("Pre-Hearing Response"); and (v) the Transcript of First Sentencing Hearing (taken January 31, 2012)(Doc. 230)("First Hearing Tr.").

In January, 2007, the Federal Bureau of Investigation ("FBI") began an investigation into a drug trafficking network involving Defendants Daniel Tarango ("Tarango"), his brother Josue Tarango,[1] Keith Salazar, and Levi Countryman. See PSR ¶ 9, at 5. The investigation determined that Tarango's network distributed large quantities of methamphetamine, cocaine, and marijuana throughout the Four Corners area of New Mexico. See PSR ¶ 9, at 5. Tarango later admitted that his organization distributed as many as thirty pounds of methamphetamine every month. See First Hearing Tr. at 59:22-24 (Swainston, Tarango).

---

[1] The Court sentenced Josue Tarango to 72-months' imprisonment for his participation in the trafficking network in a related case. See United States v. Josue Tarango, 1:08-cr-02972-JB, Judgment as to Defendant Josue Tarango, filed November 15, 2012 (Doc. 97)("Josue Judgment"). The judgment explained that although Josue was present during a search that uncovered weapons and methamphetamine, "J. Tarango appears to be at most a subordinate to D. Tarango and more likely only associated with him by living in the same home." Josue Judgment at 2 (quotations omitted). The Court thus will not discuss his participation in detail.

The FBI also found that Tarango purchased sensitive and confidential police information from Salazar and Countryman to obstruct law enforcement investigations into his operations. See Plea Agreement ¶ 8(c), at 6. Salazar was a full-time New Mexico State Police detective and member of the Region II Narcotics task force investigating Tarango's organization. See PSR ¶ 10, at 5. Salazar provided confidential information to Countryman, a former New Mexico Sheriff's Deputy, who then passed it along to Tarango. See PSR ¶ 9, at 5. Tarango, in turn, paid Salazar roughly $1,000.00 per month in cash through Countryman. See PSR ¶ 28, at 11.

Tarango received information including the identity of undercover officers and informants; the date, time, and location of pending search warrants; and even the identities of law enforcement officers' family members. See PSR ¶ 9, at 5. Much of the information allowed him to avoid arrest. When the Drug Enforcement Administration ("DEA") told Salazar that the agency would focus on Tarango and his organization, for example, Salazar quickly informed Tarango that he was a specific target and warned him to dump his phone to avoid a wiretap. See PSR ¶ 49, at 5. Countryman educated Tarango on police methods used for drug purchases with confidential informants. See PSR ¶ 43, at 15. FBI and DEA agents decided to intervene after Countryman and Tarango discussed surveillance on a Sheriff's Deputy's wife and children. See PSR ¶ 50, at 19.

On December 7, 2007, FBI and DEA agents executed a search warrant on two properties that Tarango controlled in Farmington, New Mexico. See PSR ¶¶ 52-57, at 19-21. They attempted to arrest Tarango, but he escaped on foot and eventually crossed the border into Mexico. See Sentencing Memorandum at 1. The agents' search uncovered six firearms,

ncluding two Kalashnikov[2] assault rifles, and "2 bags of [a] crystal substance."  PSR ¶ 61, at 22-

23.  The agents submitted the substance and baggies to the DEA for analysis.  By the time the

substance arrived at the DEA's laboratory, the two bags and two baggies had been placed in a

single heat-sealed KAPAC evidence bag.[3]  See DEA Report of Drug Property Collected,

Purchased, or Seized, filed August 25, 2015 (Doc. 227-1).  The DEA Laboratory combined the

contents of the two bags, which amounted to 1,289 grams:  296.4 grams of methamphetamine

and 992.6 grams of other substances.  See PSR ¶ 61, at 22.

Tarango self-surrendered at the Port of Entry in El Paso, Texas on April 3, 2009.  See

PSR ¶ 62, at 26.  He said that he returned to the United States to reunite with his wife and

children.  See First Hearing Tr. at 63:22-64:1 (Swainston).  The United States has stated that he

was fleeing assassination attempts, including a May, 2008 shooting that destroyed his Cadillac

Escalade.  See First Hearing Tr. at 46:17-25 (Swainston).

[REDACTED].

## PROCEDURAL BACKGROUND

Tarango pled guilty to conspiracy to distribute methamphetamine on December 18, 2009.

The Court added enhancements [REDACTED] and varied 5 months below the low end of the

resulting Guidelines range to sentence Tarango to 92-months' imprisonment. Tarango now

moves to reduce his sentence under recent amendments to the Guidelines that retroactively

---

[2]"Kalashnikov" refers to a series of automatic or semi-automatic rifles based on Soviet engineer Mikhail Kalashnikov's original 1947 design.  The rifles are known for their firepower, low production cost, and reliability. Of an estimated 500 million firearms worldwide, roughly 100 million belong to the Kalashnikov family.  Phillip Killicoat, Weaponomics: The Global Market for Assault Rifles 3 (World Bank Policy Research Working Paper No. 4202, 2007).

[3]KAPAK is a type of flexible stock pouch for the collection of evidence.  The pouches are heat-sealable, allowing investigators to preserve the chain of custody.  FORENSIC EXAMINATION OF FIBRES 104 (James Robertson & Michael Grieve eds., 2d ed. 1999).

reduced the base-offense levels applicable to certain drug offenses.  The United States disputes his eligibility for a reduction.

   1.      **Initial Sentencing.**

   A federal grand jury indicted Tarango, Salazar, and Countryman on December 5, 2007. The Indictment charged the three defendants with: (i) conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A); and (ii) use of a telephone to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b).  See Indictment at 1, 8, filed December 5, 2007 (Doc. 1).   On December 18, 2007, a federal grand jury issued a Superseding Indictment charging the same defendants with the same offenses.  See Superseding Indictment at 1, 8, filed December 18, 2007 (Doc. 32).

   On December 18, 2009, Tarango pled guilty to count one of the five-count Superseding Indictment.  See Plea Agreement ¶ 8(b), at 5.  The plea agreement stated that the base offense level would be determined by the drug quantity, which it stated as "1.289 kilograms of a mixture and substance containing methamphetamine, and 296.4 grams of methamphetamine actual." Plea Agreement ¶ 10(b), at 8.   Tarango waived his right to "appeal any sentence within the applicable guideline range as calculated by the Court."  Plea Agreement ¶ 13, at 9.  The parties also agreed that the Court was the final arbiter of the appropriate base offense level.  See Plea Agreement ¶ 10(b), at 8.

   The June 8, 2010 PSR measured the quantity of methamphetamine by the weight of the mixture (1.289 kilograms) rather than the weight of the pure methamphetamine alone (296.4 grams).  See PSR ¶ 62, at 26.  Noting that the offense involved between 500 and 1,500 grams of a mixture including methamphetamine, the PSR "establishe[d] a base offense level of 32."  PSR

¶ 69, at 27.  Neither the United States nor Tarango objected to this determination.  See Transcript of Second Hearing at 12-13 (taken August 26, 2015)("Second Hearing Tr.").[4]

The Court held a sentencing hearing on January 31, 2012.  See First Hearing Tr. at 1:8-10.  It reviewed the PSR's factual findings and Guidelines calculations, and adopted them as its own, stating that the defendant was involved in a "conspiracy to distribute 1.289 kilograms of a mixture and substance containing methamphetamine."  First Hearing Tr. at 111:9-10 (Court).

The Court then added 6 levels of enhancements: 2 for possession of a firearm in connection with the offense, 2 for Tarango's role as an organizer, and 2 for obstruction of justice.  See First Hearing Tr. at 22:17-111:20 (Court).  It subtracted 3 levels for Tarango's acceptance of responsibility.  See First Hearing Tr. at 56:23-57:8 (Court).  These adjustments left Tarango with a total offense level of 35 and a criminal history category of I, resulting in an advisory range from 168 to 210 months.  See Pre-Hearing Response at 2; First Hearing Tr. at 57:6-8 (Court).

[REDACTED].  The Court then denied several of the defendant's requests for downward departures based on his personal history, noting that his case "continues to fit squarely within the heartland of cases that the federal court sees."  First Hearing Tr. at 114:5-11 (Court).

The Court then weighed various factors counseling for and against an additional variance below 97 months.  [REDACTED].  It [REDACTED] recognized his poverty, lack of education, and drug-addict father's abuse, adding that "if he had not been disadvantaged as a child we might not be here today."  First Hearing Tr. at 115:22-23 (Court).  The Court remarked that "a lot of people are rehabilitating very hard before they appear for this day," but mentioned some of Tarango's positive qualities and his post-arrest rehabilitation.  First Hearing Tr. at 117:12-21

---

[4]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

(Court).  Finally, it noted his strong family connections and lack of a documented criminal history.  See First Hearing Tr. at 118:6-24 (Court).

The Court also listed [REDACTED] factors counseling against a variance.  First Hearing Tr. at 115:1-4 (Court).  [REDACTED].  Tarango had never had meaningful employment and knew little more than the criminal lifestyle that had already provided him with luxury cars.  See First Hearing Tr. at 119:1-10 (Court).  [REDACTED] Court explained that Tarango made a conscious decision to take "the easy way out" through criminal activity.  See First Hearing Tr. at 119:11-17 (Court).  [REDACTED] the "enormity of the crime" weighed against leniency.  The level of criminality did not "have just implications for a neighborhood or for individuals or for family.  This one reached out to implications for the nation."  First Hearing Tr. at 119:18 (Court).  The Court was concerned with Tarango's corruption of law enforcement, his use of its power to eliminate his competition, and the resulting lack of trust within the community.  [REDACTED], the Court explained that it had "to be mindful of respect for the law in this community" by dealing appropriately with a family business that had done a tremendous amount of damage.  First Hearing Tr. at 121:1-9 (Court).  Finally, the Court condemned Tarango's flight from authority, comparing it to his co-defendants' prompt surrender to federal agents.  See First Hearing Tr. at 121:22 -24, 122:1-6 (Court).

The Court [REDACTED] determined that half an offense level would be an appropriate variance.  See First Hearing Tr. at 122:14-15 (Court).  The applicable working range was 97 to 121 months.  U.S.S.G. Sentencing Table (2012).  A variance equal to 1 level would produce a working range of 87 to 108 months.  U.S.S.G. Sentencing Table (2012).

On January 31, 2012, the Court sentenced Tarango to 92-months' imprisonment.  See Judgment in a Criminal Case at 2, filed November 8, 2012 (Doc. 215)("Sentencing Judgment").

Tarango is currently incarcerated at the minimum-security satellite camp within the Federal Correctional Institution in Florence, Colorado.  See Motion ¶ 6, at 3.  His projected release date is April 3, 2016.  See Motion ¶ 5, at 3.

> **2.      Tarango's Motion to Reduce Sentence.**

Tarango moves the Court to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(2) and U.S.S.G. § 1B1.10.  See Motion ¶ 1, at 1.  His motion is based on Amendments 782 and 788 to the Guidelines, which retroactively reduced the base-offense levels applicable to various drug offenses.  See Motion ¶ 2, at 2.  He argues that these Amendments should reduce his offense base level by 2 levels, resulting in a new advisory range and making him eligible for a reduced sentence.  First, he says, the Court's original base offense level of 32 should be reduced to 30.  Second, the 6-level enhancements would increase this figure to 36.  Third, his acceptance of responsibility would reduce the figure to 33.  See Motion ¶¶ 2-3, at 2.

[REDACTED].  Applying this reduction to Tarango's new base offense level of 33 would result in a final base offense level of 28 and a new advisory range of 73 to 92 months.  Although Tarango has sought different sentences over time, he seems to have settled on a request for 73 months.[5]

> **3.      The Parties' Dispute.**

The United States and the Probation Officer disputed whether Tarango was eligible for a reduction under 18 U.S.C. § 3582(c)(2) and U.S.S.G. § 1B1.10.  The Probation Officer provided a memorandum on April 27, 2015 stating that Tarango was not eligible for any sentence

---

[5]Tarango argued for 79 months in his original February 26, 2015 Motion, 67 months in his May 7, 2015 Amended Motion, and 72 months in his June 1, 2015 Reply.  See Motion ¶ 5, at 3; Amended Motion ¶ 5, at 6; June Reply at 8.  He decided on 73 months in his last filing on August 26, 2015.  See Defendant's Reply to Amended Sealed Motion to Reduce Sentence Pursuant to Drug Guideline Amendment, filed August 26, 2015 (Doc. 228).

reduction under 18 U.S.C. § 3582(c)(2), which the United States adopted in part in its May 21, 2015 Response.  See Sentencing Memorandum re Retroactive Guideline Amendment at 1, filed April 27, 2015; Response re Amended Motion to Reduce Sentence ¶¶ 3-11, at 2-5, filed May 21, 2015 (Doc. 222)("Initial Response").  The United States asserted that the Court erred in the 2012 sentencing by [REDACTED] using the wrong offense base level; and [REDACTED].

     [REDACTED].

     First, the United States explained that the Court should not have used the weight of the mixed methamphetamine to determine the base offense level.  The base offense level for 296.4 grams of pure methamphetamine would have been 34 rather than 32.  The Guidelines suggested that the Court adopt the offense level determined by either "the entire weight of the mixture or substance, or . . . the weight of the . . . methamphetamine (actual), whichever is greater." U.S.S.G. § 2D1.1(c), notes (B)(emphasis added).  The United States argued that Tarango erred in concluding that "the base offense level for *his quantity of methamphetamine*" had changed. Initial Response ¶ 13, at 7 (emphasis in original).  On the contrary, it argued, "the old quantity simply is applied to the new table and 32 is the correct number using all the policy provisions that applied before and still apply."  Initial Response ¶ 13, at 7.  After the 2-level reduction, the resulting base offense level of 32 would be identical to the base offense level the Court used in 2012.   The Guidelines ranges would remain unchanged, making Tarango ineligible for relief under Amendment 782.  See Initial Response ¶ 15-16, at 8.

     [REDACTED].

     Tarango dismissed these arguments as irrelevant because the Court, he argued, has no authority to change the offense level calculation in a sentence reduction proceeding under 18 U.S.C. § 3582(c)(2).  See June Reply at 4.  U.S.S.G. § 1B1.10 requires the court to determine

"the amended guideline range that would have been applicable to the defendant if the amendment(s) to the guidelines listed in subsection (c) had been in effect at the time the defendant was sentenced."  U.S.S.G. § 1B1.10(b)(1)-(2).  The next sentence, however, allows the court to "substitute only the amendments listed in subsection (c) for the corresponding guideline provisions" and requires it to "leave all other guideline application decisions unaffected." U.S.S.G. § 1B1.10(b)(1)-(2).  Tarango argued that the Court's decision to use the mixture weight of methamphetamine [REDACTED].  He cited <u>Dillon v. United States,</u> 560 U.S. 817 (2010)(Sotomayor, J.), for the proposition that district courts reducing sentences under 18 U.S.C. § 3582(c)(2) may not correct prior sentencing errors even if they result in constitutional violations.  <u>See</u> June Reply at 4.  According to Tarango, the errors and policy goals involved in Tarango's case do not justify a corrective recalculation.

The Court scheduled a hearing on Tarango's Motion for August 26, 2015.  <u>See</u> Second Hearing Tr. at 2:20-22 (Court).  The impending hearing produced a last-minute concession from the United States, which appeared to agree that Tarango was eligible for a reduced sentence in a new response on August 25, 2015.  <u>See</u> Pre-Hearing Response at 1.  The United States attempted to explain the PSR's recommendation that Tarango's base offense level was 32.  It accepted "responsibility for drafting the plea and reciting the laboratory results in a manner that made it appear that two methamphetamine samples were involved: one a mixture and one pure," explaining that this "new information" may have caused the PSR's mistake.  Pre-Hearing Response at 5.  It stated that the Guidelines were "advisory" at the time of Tarango's sentencing and recognized that the 2012 Sentencing Memorandum might have stipulated to the mixture weight measure and base offense level.  Pre-Hearing Response at 4.  Finally, it concluded that, if the parties had stipulated to the base offense level, "the parties agree that the Court's sentencing

range is 73 to 92 months" and that Tarango was eligible for a reduced sentence.  Pre-Hearing

Response at 4.

The United States made only minimal arguments on the sentencing considerations under

18 U.S.C. § 3553(a).  Although it argued in a single sentence that these sentencing factors were

"not properly before the court," it failed to explain its reasoning.  Pre-Hearing Response at 6.  It

proceeded to note: "Prison misconduct may be a consideration under the § 3553(a) factors,

especially the need to deter future criminal conduct and to protect the public." Pre-Hearing

Response at 5 (citations omitted).   It explained that the Bureau of Prisons classifies prison

misconduct into different tiers, depending on its seriousness:

> **100 series** – Greatest Severity (killing, assaulting, setting fires, etc.);
>
> **200 series** – High Severity (escape, fighting, threatening, etc.);
>
> **300 series** – Moderate Severity (indecent exposure, misuse of medication, unauthorized money, etc.); and
>
> **400 series** – Low Severity (malingering, abusive language, unauthorized contact, etc.).

Pre-Hearing Response at 6. It then provided the Bureau of Prisons SENTRY Report[6]

listing all charged misconduct since Tarango was sentenced on January 31, 2012:

> 10/13/2014      316 – Being in an unauthorized area
>
> 09/2/12014      108 – Possession of a hazardous tool
>
> 04/22/2014      108 – Possession of a hazardous tool
>
> 02/13/2014      108 – Possession of a hazardous tool

---

[6]The SENTRY system is the Federal Bureau of Prisons' primary database for inmate tracking.  The program collects and stores "information relating to the care, classification, subsistence, protection, discipline, and programs of federal inmates."  Federal Bureau of Prisons, Privacy Impact Assessment for the SENTRY Inmate Management System (2012).

See Pre-Hearing Response at 6.   It also clarified, however, that all of the "hazardous tool" incidents involved unauthorized cellular phones.  See Pre-Hearing Response at 6.  Although the United States stated that "there appears to have been something untoward occurring in 2014," it conceded that there was a "lack of a consistent pattern."   See Pre-Hearing Response at 6-7. Given the "policy objectives of Amendment 782," and "the Court's ability to monitor the Defendant on supervised release," the United States agreed not to object to any sentence within the Court's "authorized sentencing discretion."  Pre-Hearing Response at 6.

Tarango argued that he "has learned from his errors, has actively sought to steer friends and family away from the same mistakes, and has made productive use of his time while in prison."  June Reply at 2.  He pointed to his transcripts and certificates from prison education programs, including a GED.  See Prison Transcript and Certificates at 9-31, filed August 26, 2015 (Doc. 228).  He provided letters from relatives and friends describing how he has changed and continued his relationship with his children from within the prison.  See Letters from Josue Tarango, Amber Baca, Joni Duran, Irene Moreno, and Elisette Moreno at 4-8, filed August 26, 2015 (Doc. 228).  One of these letters, from his half-sister, explained that he helped to care for her when she suffered from a childhood brain tumor.  See Letter from Amber N. Baca at 6, filed August 26, 2015 (Doc. 228).

### 4.    The Hearing.

The August 26, 2015 hearing fleshed out the limited scope of the United States' concession.  The United States stated that, if the Court reaffirmed its decision to use the mixture weight measure for methamphetamine, Tarango would be entitled to a reduction in his sentence. See Second Hearing Tr. at 12:4-16 (Pflugrath).   Tarango offered the Court "two possible options": either affirm the mixture weight measure included "by stipulation in the plea

agreement and in four different areas of the sentencing transcript," or find that the measure was an error.  Second Hearing Tr. at 21:23-24, 22:1-7 (Converse).  According to the United States, the Court could simply affirm that the mixture weight was not an error (a matter allegedly within the Court's discretion), and the parties could agree that the defendant was eligible for a reduced sentence.  See Second Hearing Tr. at 7:17-19, 12:4-16 (Pflugrath).  Tarango also conceded that variances were not part of the applicable Guideline level.  See June Reply at 8.

The parties continued to disagree, however, on the consequences of an error.  The United States argued that the Court had "to go back and ask what [Tarango] would get today," because the question is whether "Amendment 782 resulted in a lowering of the low end of his guideline range."  Second Hearing Tr. at 29:14-18 (Pflugrath).  Tarango maintained that "[y]ou don't get to tinker around," because any recalculations would "fly in the face both of the plain language of the guideline and the plain language of _Dillon_."  Second Hearing Tr. at 22:17, 23:6-9 (Converse).

The hearing also led to a discussion of the 18 U.S.C. § 3553(a) sentencing factors.  The United States largely left these arguments to the defense, although it did note that the hidden cellular phone incidents were "serious offenses."  Second Hearing Tr. 41:20.  It also cited an unnamed case in which another district court noted that "it would consider an affront to the Court if after having granted the low end of what was available the defendant then committed an offense."  Second Hearing Tr. at 35:3-9 (Pflugrath).

Tarango repeated his earlier arguments on his upbringing, prison education, and strong connections with his family.  Second Hearing Tr. at 38:18-39:7 (Converse).  He added that there was evidence that he "maybe wasn't the top of [the conspiracy] after all," including his nickname, the Runt.  Second Hearing Tr. at 38:15-17 (Converse).  He noted that the sentence

"starting point" was "now two levels lower, and so your ending point should be two levels lower."  Second Hearing Tr. at 38:1-2 (Converse).

Finally, Tarango argued that any reduction would provide him with very little benefit. He contended that he has already lost the benefit of the full reduction possible under Amendments 782 and 788.  See Second Hearing Tr. at 34:5-19 (Converse).  According to Tarango, if the Court granted him the greatest possible reduction in sentence, he would have been released 19 months ago.  See  Second Hearing Tr. at 34:5-19 (Converse).  The rule prohibiting release until November 1, 2015, means that the Amendments will be of limited use to him.  He noted that his current release date of April 3, 2016, means "he's going to be released to a halfway house shortly regardless of the court's ruling on this," estimating the date at "sometime between October and January of this year."   Second Hearing Tr. at 33:22-34:5 (Converse).

## LAW  REGARDING THE UNITED STATES SENTENCING GUIDELINES.

Courts applying the Guidelines must proceed by: (i) carefully calculating the correct Guidelines range; (ii) making Guidelines-contemplated departures under parts 5H and 5K; and (iii) varying from the resulting Guidelines range based on the factors listed at § 3553(a).  Each of these steps involves complex rules that must be applied with precision.

### 1.    Background Law on the Guidelines.

In United States v. Booker, 543 U.S. 220 (2005)(Stevens, J.), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, thus making the Guidelines sentencing ranges effectively advisory.  See 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect,

and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate

courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S.

at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C.

§ 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective
> manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  Section 3551 provides that

> a defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.

To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i)

the Guidelines; (ii) the offense's nature and the defendant's character; (iii) the available

sentences; (iv) the policy favoring sentencing uniformity for defendants who commit similar

crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the

United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are

one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable

deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)(Breyer, J.)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(Tymkovich, J.)(describing the Guidelines as "not just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 38 (2007)(Stevens, J.), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(Anderson, J.)(unpublished).[7]  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with

---

[7] United States v. White is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent. . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(Brorby, J.).  The Court finds that United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(Baldock, J.); United States v. Davis, 599 F. App'x 815 (10th Cir. 2013)(Holloway, J.); United States v. Mendoza-Haro, 595 F. App'x 829 (10th Cir. 2014)(Matheson, J.); United States v. Burkins, 596 F. App'x 685 (10th Cir. 2014)(Phillips, J.); United States v. McKneely, 588 F. App'x 845 (10th Cir. 2014)(Lucero, J.); United States v. Vann, 593 F. App'x 782 (10th Cir. 2014)(Phillips, J.); United States v. Shines, 527 F. App'x 663 (10th Cir. 2013); and United States v. Kort, 440 F. App'x 678 (10th Cir. 2011)(Brorby, J.) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006)(Krieger, J.), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008)(Tacha, J.).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007)(Ginsburg, J.).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  Kimbrough v. United States, 552 U.S. at 89.

### 2.    Calculating the Initial Sentencing Range.

Courts in initial sentencing proceedings must adhere to a three-step sequence:

[F]irst, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222 (D.N.M. 2014)(Browning, J.).

Attorneys and courts often say that the Guidelines are advisory, but it appears more appropriate to say that the Guidelines ranges are advisory.  See Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(Baldock, J.)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)(Lucero, J.)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").

Appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  See Irizarry v. United States, 553 U.S. 708, 710-16 (2008)(Stevens, J.).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. at 51 (holding that a sentence is procedurally

reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence")(emphasis added).

In drug trafficking sentencing cases, courts calculate the initial true Guidelines range using the Drug Quantity Table at U.S.S.G. § 2D1.1(c). Note (B) to Drug Quantity Table specifies that a court sentencing for an offense involving a mixture of methamphetamine with another inert substance should "use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the . . . methamphetamine (actual), whichever is greater." U.S.S.G. § 2D1.1(c) n.(B)(emphasis added). See United States v. Davis, 599 F. App'x 815, 817 (10th Cir. 2013)(Holloway, J.)(unpublished)("The Guidelines dictate that a defendant's advisory sentencing range for methamphetamine distribution is to be calculated using whichever drug weight -- actual or mixed -- would produce the greater offense level.").

This decision was a deliberate move on the part of the Sentencing Commission to "increase the offense level for methamphetamine traffickers whose offenses involved purer methamphetamine mixtures," because drug purity "is probative of the defendant's role or position in the chain of distribution." United States v. Baez Perez, 515 F. App'x 866, 868 (11th Cir. 2013)(per curiam)(quotations omitted)(unpublished). The difference can result in significantly different sentences:

> Under the Tables, one gram of actual methamphetamine is equivalent to twenty kilograms of marijuana, and one gram of methamphetamine mixture is equivalent to two kilograms of marijuana. In other words, a ten-to-one ratio is employed in calculating sentences for actual methamphetamine versus methamphetamine mixture in the Guidelines.

United States v. Davis, 599 F. App'x at 817 (rejecting defendant's challenge to the sentencing disparity); United States v. Kort, 440 F. App'x 678, 685 (10th Cir. 2011)(Brorby, J.)(unpublished)("[I]t is evident the Sentencing Commission recommends a higher offense level for 'Ice' methamphetamine, in part, because a drug of such high purity can be 'cut' with other substances for distribution in larger quantities.").

Flaws in the base offense level calculation are reversible procedural error. See United States v. Dighera, No. 05-40033-01-SAC, 2006 WL 1302139, at *2 (D. Kan. Apr. 17, 2006)(Crow, J.)(unpublished)("To not apply [the base offense level] provision in this fashion would be error under the Guidelines."). In United States v. Gigley, 213 F.3d 509, 519 (10th Cir. 2000)(Baldock, J.), for example, the United States District Court for the District of Kansas used the mixture weight of methamphetamine rather than the weight of the pure substance, resulting in a base offense level of 32 instead of the correct level of 36. 213 F.3d at 519. The Tenth Circuit remanded the case for new calculations, explaining that "The district court should have used the quantity of methamphetamine (actual) to find the base offense level because it produces a higher sentence." 213 F.3d at 519.

[REDACTED].

       [REDACTED].        **Variances from the Guidelines.**

Courts are not required to apply sentences within the calculated Guidelines range. The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted). See

United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)(Murphy, J.)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

In the third step, district courts may vary from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. See United States v. Nolf, 30 F. Supp. 3d at 1214 (citing U.S.S.G. § 1B1.1(c)). The Supreme Court has recognized that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89.

Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

[REDACTED].

## LAW REGARDING SENTENCE REDUCTIONS

District courts require specific grants of authority from Congress and the Sentencing Commission in order to reduce previously imposed sentences. Two new grants, Amendments

782 and 788, have made thousands of prisoners convicted of drug offenses eligible for sentence reductions.  Courts performing sentence reductions under § 3582(c)(2) must determine (i) whether a prisoner is eligible for a reduction; and (ii) whether, in their discretion, they should grant the reduction.  They have very limited authority to revisit sentencing courts' initial decisions.

### 1.     Authority for Sentence Reductions.

Courts have limited authority to modify defendants' original sentences.  "A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization." United States v. Mendoza, 118 F.3d at 709.  Accord United States v. Cramberg, No. CR 10-3244 JB, 2012 WL 3656477, at *2-3 (D.N.M. Aug. 21, 2012)(Browning, J.); United States v. Christy, No. 10-1534 JB, 2012 WL 3150352, at *4-5 (D.N.M. July 16, 2012)(Browning, J.); United States v. Padilla, No. 09-3598 JB, 2012 WL 2175749, at *2 (D.N.M. May 31, 2012)(Browning, J.); United States v. Vigil, No. 05-2051 JB, 2010 WL 2301708, at *3-4 (D.N.M. May 4, 2010)(Browning, J.); United States v. Myers, 375 F. Supp. 2d 1293, 1296 (D.N.M.2005)(Browning, J.).  The Tenth Circuit has explained:

> A district court is authorized to modify a Defendant's sentence only in specified instances where Congress has expressly granted the court jurisdiction to do so. Section 3582(c) of Title 18 of the United States Code provides three avenues through which the court may "modify a term of imprisonment once it has been imposed.  A court may modify a sentence: (1) in certain circumstances "upon motion of the Director of the Bureau of Prisons"; (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure"; or (3) "upon motion of the defendant or the Director of the Bureau of Prisons," or on the court's own motion in cases where the applicable sentencing range "has subsequently been lowered by the Sentencing Commission."

United States v. Blackwell, 81 F.3d 945, 947 (10th Cir. 1996)(Baldock, J.).  This third set of cases falls within 18 U.S.C. § 3582(c)(2), which provides that

> in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(2).

### 2.  **Amendments 782 and 788.**

The Sentencing Commission has a responsibility to periodically "review and revise" its Guidelines.  28 U.S.C. § 994(o).  It may choose to reduce the term of imprisonment "recommended in the guidelines applicable to a particular offense or category of offenses," but it must "specify in what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for the offense may be reduced."  28 U.S.C. § 994(u).  Congress has directed the Sentencing Commission to formulate its Guidelines "to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission." 28 U.S.C. § 994(g).

On April 10, 2014, the United States Sentencing Commission voted unanimously to reduce the Guidelines for most drug trafficking offenses.  Its Amendment 782 revised the Guidelines for drug trafficking offenses by modifying how specific quantities of drugs relate to the statutory minimum penalties.  Amendment 782 "reduced by two levels the offense levels assigned to the quantities that trigger the statutory mandatory minimum penalties, resulting in corresponding guideline ranges that include the mandatory minimum penalties, and made conforming changes" to the drug quantity tables at U.S.S.G. §§ 2D1.1 and 2D1.11.  U.S. SENTENCING COMM'N, 2014 DRUG GUIDELINES AMENDMENT RETROACTIVITY DATA REPORT at 2 (August 2015)("Retroactivity Report").  A defendant convicted of possession with intent to

distribute cocaine, for example, would receive a lower base offense level and thus a lower Guidelines range.

The Sentencing Commission gave this Amendment retroactive effect on July 18, 2014, by approving Amendment 788.  Amendment 788: (i) added Amendment 782 to the list of amendments authorized for retroactivity in U.S.S.G. § 1B1.10; and (ii) required that the effective date of any orders retroactively reducing terms of imprisonment be November 1, 2015, or later. See Retroactivity Report at 3.  The Sentencing Commission found that "The administrative burdens of applying Amendment 782 retroactively are significant but manageable given the one-year delay in the effective date, which allows courts and agencies more time to prepare." U.S.S.G. App. C, Amend. 788 at 87 (2014).  Amendments 782 and 788 became law when Congress failed to overrule or modify their proposed changes before November 1, 2014.  See Retroactivity Report at 2-3.

### 3. Process for Sentencing Reductions.

Section § 3582(c)(2) creates a two-step process for courts considering sentence reductions.  First, courts must "determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." United States v. McGee, 615 F.3d 1287, 1292 (10th Cir. 2010)(Briscoe, J.)(citation omitted).  Second, courts must determine whether to proceed to reduce the sentence.  See United States v. Battle, 706 F.3d 1313, 1317 (10th Cir. 2013)(Lucero, J.)(quotation omitted)("If a reduction is authorized, the court may consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular

circumstances of the case.").[8]  The determination is "unambiguously discretionary," even when the Guidelines range is reduced.  United States v. Vautier, 144 F.3d 756, 760 (11th Cir. 1998)(Hull, J.).

### 4.    Limits on Sentencing Reductions.

Congress and the Sentencing Commission have placed four primary restrictions on the relief available under 18 U.S.C. § 3582(c)(2) and the relevant Amendments.  First, courts cannot reduce the term of imprisonment below time served.  See U.S.S.G. § 1B1.10 cmt. app. n.1(B)(3). Second, any retroactive reductions based on Amendment 788 cannot take effect until November 1, 2015.  See U.S.S.G. § 1B1.10 cmt. app. n.1(B)(6).

Third, in most cases, courts may not reduce a defendant's sentence below the new Guidelines ranges resulting from the base offense level recalculation.  See U.S.S.G. § 1B1.10 cmt. app. n.3 ("[T]he court shall not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range determined.").  For example, if a Guidelines range changes from 41-51

---

[8]The Application Notes for U.S.S.G. § 1B1.10 mention two considerations in addition to the standard § 3553(a) factors:

> **(ii) Public Safety Consideration.--**The court shall consider the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment in determining: (I) Whether such a reduction is warranted; and (II) the extent of such reduction, but only within the limits described in subsection (b).

> **(iii) Post-Sentencing Conduct.--**The court may consider post-sentencing conduct of the defendant that occurred after imposition of the term of imprisonment in determining: (I) Whether a reduction in the defendant's term of imprisonment is warranted; and (II) the extent of such reduction, but only within the limits described in subsection (b).

U.S.S.G. § 1B1.10 cmt. app. n.1(B)(ii-iii).  These factors overlap with the § 3553(a) factors, and the Court considers both of them below.

to 30-37, the court cannot reduce the sentence below 30 months.  U.S.S.G. § 1B1.10 cmt. app. n.3.

The reduction is not limited to the minimum of the amended Guidelines range, however, when a defendant originally received a below-Guideline sentence because of a United States motion to reflect the defendant's substantial assistance to authorities.  See U.S.S.G. § 1B1.10 (b)(2)(B).  Instead, a sentence "comparably less than the amended guideline range" may be appropriate.  U.S.S.G. § 1B1.10 (b)(2)(B).  See Dillon v. United States, 560 U.S. at 826-27 ("Only if the sentencing court originally imposed a term of imprisonment below the Guidelines range does § 1B1.10 authorize a court proceeding under § 3582(c)(2) to impose a term 'comparably' below the amended range.").  For example, if the court granted a twenty-percent downward departure from the original Guidelines range because of the defendant's substantial assistance to authorities, it may grant a twenty-percent downward departure from the revised Guidelines range.  See U.S.S.G. § 1B1.10 cmt. app. n.4(B).

Fourth, a district court may lack jurisdiction to grant a sentence reduction if the defendant's original sentence was "based on" a statutory mandatory minimum sentence rather than a Guidelines range.  The Guidelines explain that

> a reduction in the defendant's term of imprisonment is not authorized under 18 U.S.C. 3582(c)(2) and is not consistent with this policy statement if . . . (ii) an amendment listed in subsection (d) is applicable to the defendant but the amendment does not have the effect of lowering the defendant's applicable guideline range because of the operation of another guideline or statutory provision (e.g., a statutory mandatory minimum term of imprisonment).

U.S.S.G. 1B1.10 cmt. n.1(A).[9]

---

[9]District courts must make this determination after the calculation of the base offense level, but before any discretionary departures.  "Applicable guideline range," as used in the Guidelines, means "the guideline range that corresponds to the offense level and criminal history category determined pursuant to 1B1.1(a), which is determined before consideration of any

In United States v. Shines, 527 F. App'x 663 (10th Cir. 2013)(Lucero, J.)(unpublished), for example, the defendant's Guidelines range was 30 to 37 months, but he received a mandatory minimum sentence of 60-months' imprisonment for a separate firearms offense under 21 U.S.C. § 844.   527 F. App'x at 664.   After his sentencing, Amendment 750 of the Guidelines retroactively reduced certain offense levels for cocaine base offenses.   See 527 F. App'x at 665. The Tenth Circuit rejected the defendant's motion for a sentence reduction, explaining: "We also note that Shines' sentence was based on a statutory minimum.   And because Amendment 750 does not lower this mandatory minimum, a reduction in his term of imprisonment is not authorized by § 3582(c)(2)."   527 F. App'x at 665.   See United States v. Osborn, 679 F.3d 1193, 1195 n.1 (10th Cir. 2012)(Briscoe, J.)("[I]n many cases, the operation of the statutory minimum sentence will preclude a sentence reduction under 18 U.S.C. § 3582(c)(2)."); United States v. Lucero, 713 F.3d at 1028 (10th Cir.)(Briscoe, J.)("[A] district court does not have discretion to sentence below the statutorily mandated minimum sentence that applied when the defendant was initially sentenced.").

The Courts of Appeals have split on these provisions' application to defendants who receive sentences below the mandatory minimums under § 5K1.1.   Some Courts of Appeals have held that once the sentencing court has departed below the mandatory minimum, the defendant is no longer eligible for a reduction under 18 U.S.C. § 3582(c)(2) on the grounds that the sentence remains "based on" the mandatory minimum rather than the Guidelines range.   These courts first look to U.S.S.G. § 1B1.10(a)(1), which allows them to reduce a sentence if there is a change in the "guideline range applicable to that defendant."   See United States v. Hood, 556 F.3d 226, 234

departure provision in the Guidelines Manual or any variance."   U.S.S.G. 1B1.10 cmt. n.1(A). See United States v. White, 765 F.3d 1240, 1242 (10th Cir. 2014)(Ebel, J.)(describing this rule as "well-settled").

(4th Cir. 2009)(Niemeyer, J.).  They then rely on U.S.S.G. § 5G1.1(b), which states: "Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence."  U.S.S.G. 5G1.1(b)(emphasis added).  They interpret this provision to mean that the "guideline range applicable" from U.S.S.G. § 1B1.10(a)(1) becomes the mandatory minimum sentence.  See United States v. Hood, 556 F.3d at 233.  In short, "the statutory minimum, and not the guideline range, is the correct starting point for imposing a sentence under § 3553(e)."  United States v. Benton, 546 F. App'x 365, 369 (5th Cir.)(Higginson, J.)(unpublished)(holding that defendant's sentence was "based on" mandatory minimum rather than a "sentencing range that was subsequently lowered" by Amendments to the Guidelines).

These Courts of Appeals ignore even a district court's express consideration of the Guidelines range.  In United States v. Hood, for example, the district court referenced the applicable Guidelines range after granting the United States' § 5K1.1 motion to reduce the defendant's sentence below the mandatory minimum.  See 556 F.3d at 237.  The Fourth Circuit described these comments as "legally insignificant for purposes of the analysis under § 3582(c)(2)" and concluded that, "[a]t this point, Hood's sentence was 'based on' the mandatory minimum of 240 months, rather than the otherwise applicable guideline range."  556 F.3d 226 at 233-234.  See United States v. Brown, No. 1:08-CR-388-1, 2015 WL 5167076, at *2 (M.D.N.C. Aug. 17, 2015)(Beaty, J.)(applying United States v. Hood).

More recent developments have called these decisions into question.  The Policy Statement on sentence reductions now allows that,

> if the case involves a statutorily required minimum sentence and the court had the authority to impose a sentence below the statutorily required minimum sentence pursuant to a government motion to reflect the defendant's substantial assistance to authorities, then for purposes of this policy statement the amended guideline

range shall be determined without regard to the operation of § 5G1.1 (Sentencing on a Single Count of Conviction) and § 5G1.2 (Sentencing on Multiple Counts of Conviction).

U.S.S.G. 1B1.10(c).  The Sentencing Commission passed this change to resolve this "based on" issue:

> The guidelines and the relevant statutes have long recognized that defendants who provide substantial assistance are differently situated than other defendants and should be considered for a sentence below a guideline or statutory minimum even when defendants who are otherwise similar (but did not provide substantial assistance) are subject to a guideline or statutory minimum. Applying this principle when the guideline range has been reduced and made available for retroactive application under section 3582(c)(2) appropriately maintains this distinction and furthers the purposes of sentencing.

U.S.S.G. supp. to app. C, amend. 780 (Reason for Amendment)(Nov. 1, 2014)(internal quotation and citation omitted).

The D.C. Circuit has also rejected the Fourth and Fifth Circuits' reasoning.  In In re Sealed Case, 722 F.3d 361 (D.C. Cir. 2013)(Griffith, J.), the United States opposed a sentence reduction because the defendant had already received a sentence below the mandatory minimum under § 5K1.1.  The D.C. Circuit attacked the United States' argument as resting on the "flawed premise that these defendants' 'applicable guideline ranges' are their mandatory minimum 'guideline sentences,' which amendments to the Guidelines cannot lower."  722 F.3d at 369.

The D.C. Circuit explained that the United States' interpretation was inconsistent with the Guidelines.  See 722 F.3d at 369.  First, it noted that sentencing courts must use a defendant's base offense level and criminal history category to determine a Guidelines range before determining whether a mandatory minimum trumps that range.  See 722 F.3d at 369.  The mandatory minimum thus "*acts upon* the already determined 'applicable guideline range'; it does not *become* the guideline range."  722 F.3d at 369-70 (emphasis in original).  Second, the D.C. Circuit pointed out that even U.S.S.G. § 5G1.1 distinguishes between an "applicable guideline

- 29 -

range" and a "statutorily required minimum sentence."  722 F.3d 361 at 369.  Third, the court

pointed to numerous Guidelines provisions inconsistent with the United States' position:

> U.S.S.G. § 1B1.10(b) states that the maximum reduction a defendant may receive
> is a reduction to the low end of his new, post-amendment guideline range, *unless*
> he was sentenced below his applicable guideline range pursuant to one of several
> government motions that may be filed to reward substantial assistance. U.S.S.G. §
> 1B1.10(b)(2)(B). Those motions, according to the Guidelines commentary, are
> U.S.S.G. § 5K1.1, Fed. R. Crim. P. 35(b), and *18 U.S.C. § 3553(e). Id.* § 1B1.10,
> cmt.3. The Commission, in other words, clearly anticipated that *some* prisoners
> who received sentences lower than their mandatory minimums thanks to §
> 3553(e) motions would nevertheless be eligible for sentence reductions.

722 F.3d at 370 (emphasis in original).  The D.C. Circuit concluded that § 3582(c)(2) relief is

available to defendants "who avoided a mandatory minimum sentence because of their

substantial assistance."  722 F.3d at 368.

### 5.      Error Correction and Sentence Reductions.

The Guidelines give specific guidance to courts performing sentence reductions.[10]  First,

courts "shall determine the amended guideline range that would have been applicable to the

defendant if the amendment(s) to the guidelines listed in subsection (d) had been in effect at the

time the defendant was sentenced."  U.S.S.G. § 1B1.10(b)(1).  In making this decision, they

"shall substitute only the amendments listed in subsection (d) for the corresponding guideline

provisions that were applied when the defendant was sentenced and shall leave all other

guideline application decisions unaffected."  U.S.S.G. § 1B1.10(b)(1)(emphasis added).  See

Freeman v. United States, 131 S. Ct. 2685, 2693 (2011)(Kennedy, J.)(plurality)("The binding

---

[10]Sentence reduction hearings under this statute are not full resentencing proceedings. See
U.S.S.G. § 1B1.10(a)(3)("[P]roceedings under 18 U.S.C. § 3582(c)(2) and this policy statement
do not constitute a full re-sentencing of the defendant."); Dillon v. United States, 560 U.S. at 83
("[Section] 3582(c)(2) does not authorize a resentencing. Instead, it permits a sentence reduction
within the narrow bounds established by the Commission."); United States v. Lucero, 713 F.3d at
1028 ("Sentence modification under § 3582(c) does not amount to 'resentencing.'")(Briscoe, J.).

policy statement governing § 3582(c)(2) motions places considerable limits on district court discretion.  All Guidelines decisions from the original sentencing remain in place, save the sentencing range that was altered by retroactive amendment.").  In other words, "district courts cannot recalculate aspects of a sentence that are unaffected by a retroactively applicable amendment to the Guidelines."  United States v. Washington, 759 F.3d 1175, 1182 (10th Cir. 2014)(Murphy, J.).

The Supreme Court has interpreted "all other guideline application decisions" broadly, holding that courts generally cannot revisit sentencing courts' calculations.  In United States v. Dillon, the defendant argued that the sentencing court's decision to treat the Guidelines as mandatory violated his constitutional rights under United States v. Booker.  560 U.S. at 831. The Supreme Court rejected the defendant's attempt to "recalculate" his sentence and correct the error, explaining that this aspect of his sentence was "outside the scope of the proceeding authorized by § 3582(c)(2)."  560 U.S. at 831.

Recent cases follow a similar pattern.  In United States v. Burkins, 596 F. App'x 685 (10th Cir. 2014)(Phillips, J.)(unpublished), for example, the defendant argued that the original sentencing court had failed to make a proper drug quantity finding.  See 596 F. App'x at 690. The Tenth Circuit rejected his arguments, noting that, "[w]hile he couches his argument as a request for this court merely to consider his eligibility using the drug quantity from his indictment, in substance, he is collaterally attacking his original sentence." 596 F. App'x at 690. United States v. McKneely, 588 F. App'x 845 (10th Cir. 2014)(Lucero, J.)(unpublished), similarly rejected a defendant's contention that the sentencing court had miscalculated his offense level and criminal history.  The Tenth Circuit stated that "[t]he district court lacked authority to reconsider these issues under § 3582(c)(2)."  588 F. App'x at 846.  See United States

v. Barner, 350 F. App'x 678, 681 (3d. Cir. 2009)(Hardiman, J.) (unpublished)(rejecting inmate's challenge to criminal history calculation at original sentencing).

Although the Tenth Circuit has not addressed this issue directly, its only opinion allowing a court to vary from an autonomic application of the reduced base offense levels involved a range of possible drug quantities.  See United States v. Battle, 706 F.3d 1313.  The exception in United States v. Battle resulted from a practical problem.  706 F.3d at 1318.  Before Amendment 706, 1.5 kilograms or more of crack incurred the highest possible base offense level.  Because the Tenth Circuit

> rejects assertions of errors in drug quantity calculations as harmless if they do not affect the defendant's Guidelines range, *see, e.g., United States v. Jeppeson*, 333 F.3d 1180, 1182 n.2 (10th Cir. 2003), many district courts have acted in the interest of judicial economy and found that various defendants cross that 1.5 kilogram threshold without settling on a specific weight.

706 F.3d at 1318.  The defendants in these cases often argue that the subsequent court cannot use a higher, more specific drug quantity.  Every Court of Appeals to consider the issue, however, has allowed the court performing the reduction to supplement its initial calculations of drug quantity.  See United States v. Woods, 581 F.3d 531, 538 (7th Cir. 2009)(Williams, J.), overruled on other grounds by United States v. Taylor, 778 F.3d 667, 670 (7th Cir. 2015)(Hamilton, J.); United States v. Hernandez, 645 F.3d 709, 713 (5th Cir. 2011)(per curiam); United States v. Jones, 388 F. App'x. 314, 315 (4th Cir. 2010)(per curiam)(unpublished).  These calculations must be consistent with the court's original findings and the PSR's statements.  See United States v. Battle, 706 F.3d at 1321.

In United States v. Battle, the district court found at the original sentencing hearing that the defendant had trafficked "more than 1.5 kilograms of crack cocaine."  706 F.3d at 1314.  It also reached the "inescapable conclusion that well over 1.5 kilograms of crack cocaine was

distributed by this conspiracy and that this amount was foreseeable to Shawn Battle as the head

of that conspiracy."  706 F.3d at 1315-16.  Although the Tenth Circuit rejected the district

court's subsequent attempt to attribute 3.4 kilograms to Battle on factual grounds, it allowed the

court to look back to the original PSR "to make supplemental calculations of drug quantity at

resentencing."[11]  706 F.3d at 1319.  It raised, but did not decide, the question whether the court

could engage in new fact-finding.  See 706 F.3d at 1319.

Other courts have applied United States v. Battle narrowly.  In United States v. Vann,

593 F. App'x 782, (10th Cir. 2014)(Phillips, J.)(unpublished), for example, the defendant sought

a reduction in his sentence under § 3582(c).  See 593 F. App'x at 782.  He argued that the

sentencing court erred by (i) double-counting the weight of cocaine base, and (ii) failing to find

an exact total weight of cocaine base.  See 593 F. App'x at 785-86.  The district court rejected

the double-counting argument, because "the time and place to seek relief would be in the trial

court, on direct appeal, or even perhaps on a habeas petition." 593 F. App'x at 785.  It

distinguished United States v. Battle on the ground that the sentencing court "made a specific,

determinate finding that Vann's offense had involved 8,786.55 grams of cocaine base." 593 F.

App'x at 786.  See United States v. Burkins, 596 F. App'x at 690 n.6 (distinguishing United

States v. Battle on similar grounds).

## ANALYSIS

The Court will grant Tarango's Motion and reduce his sentence to 73 months.  The Court

first concludes that Tarango is eligible for a reduction consistent with U.S.S.G. § 1B1.10.  The

---

[11]The Tenth Circuit used the term "resentencing," but also cited the prohibition on "resentencing proceedings" set out in Dillon v. United States.  See United States v. Battle, 706 F.3d at 1317 (citing Dillon v. United States, 560 U.S. at 825).  d

Court erred by [REDACTED] calculating the applicable base offense level using the weight of the mixture of methamphetamine rather than the weight of the pure methamphetamine [REDACTED].  The Court cannot correct its [REDACTED] error, because § 3582(c)(2) and U.S.S.G. § 1B1.10 limit its ability to revise its original sentencing calculations.  Tarango is thus eligible for a reduction in his base offense level and sentence under the new Amendments to the Guidelines.

Second, the Court determines that the authorized sentence reduction is warranted here. While the Court has reservations about applying the new 2-level reduction to a sentence that it worked hard to craft in 2012, it will defer to the political branches' expression of the popular will to reduce the federal prison populations of convicted drug traffickers.  The Court will reduce Tarango's sentence to 73 months, in part because the United States has not objected to the revision and Tarango has not otherwise upset the Court's original balance of factors under § 3553(a).   [REDACTED].

I.     **TARANGO IS ELIGIBLE FOR A  REDUCTION CONSISTENT WITH U.S.S.G. § 1B1.10, BECAUSE THE COURT CANNOT CORRECT ITS PRIOR GUIDELINES CALCULATION MISTAKES.**

The United States' argument that Tarango is not eligible for a sentence reduction relies on two assertions: (i) the Court erroneously calculated Tarango's base offense level as 32 instead of 34; and (ii) the Court should correct this mistake.  Initial Response ¶¶ 11-13, at 6-7.  Under this theory, the Guidelines changes would subtract 2 base offense levels from Tarango's true, higher sentence, making it identical to his current sentence and thus rendering him ineligible for a sentence reduction.  See Initial Response ¶ 16, at 8.  The Court agrees that it erred by miscalculating Tarango's sentence, but disagrees that it can correct its prior mistake.

**A.   THE COURT ERRED BY CALCULATING TARANGO'S BASE OFFENSE LEVEL USING THE WEIGHT OF THE MIXTURE OF METHAMPHETAMINE RATHER THAN THE WEIGHT OF THE PURE METHAMPHETAMINE.**

The Court's decision to consider the weight of the mixture instead of the weight of the pure methamphetamine was inconsistent with the Guidelines.  Note (B) to the drug quantity table at U.S.S.G. § 2D1.1(c) requires the Court to "use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the . . . methamphetamine (actual), whichever is greater."  U.S.S.G. § 2D1.1(c) n.(B)(emphasis added). This rule reflects the Sentencing Commission's decision that, "[s]ince controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1 cmt. 9.

The Court could have measured the quantity of methamphetamine using either the weight of the mixture (1.289 kilograms) or the weight of pure methamphetamine alone (296.4 grams). Using the weight of the pure methamphetamine would have resulted in a base offense level of 34.  See U.S.S.G. § 2D1.1(c)(3).  Following the PSR, the Court instead applied the mixture weight, resulting in a base offense level of 32.  See U.S.S.G. § 2D1.1(c)(4).  In short, the PSR failed to make the correct calculation; the pure weight measure would have led to the "greater" base offense level of 34.  The parties and the Court did not identify this mistake.  See PSR ¶ 69, at 27; Second Hearing Tr. at 13:15-22 (Court).

The United States incorrectly suggests that the Court did not err because "there is only one quantity of methamphetamine analyzed in this case, which can be expressed just as

accurately in two ways."[12]  Pre-Hearing Reply at 3.  It states that, after United States v. Booker,

543 U.S. 220, that determining the purity of methamphetamine is "within the Court's discretion."

Pre-Hearing Reply at 3.  It contends that the Court can pick and choose how to calculate the

Guidelines range as it goes through the calculation because the Guidelines are advisory.  See

Second Hearing Tr. at 7:15-8:10 (Pflugrath, Court).  The Court disagrees. In calculating the

correct Guidelines range, the Court did not have the discretion to ignore Note (B) to the drug

quantity table.

The calculation of the Guidelines range must include a proper calculation of the base

offense level.  See U.S.S.G. § 1B1.1.  See Gall v. United States, 552 U.S. at 51 (defining

"significant procedural error" to include "failing to calculate (or improperly calculating) the

Guidelines range").

The United States' argument that, after United States v. Booker, the Guidelines "are no

longer mandatory" and that determining the purity of methamphetamine is entirely "within the

Court's discretion" is unconvincing for two primary reasons.  Pre-Hearing Reply at 3.  First, the

Court grants significant deference to the Guidelines as an expression of the will of the people as

expressed through its elected political representatives.  The Guidelines represent "eighteen years'

worth of careful consideration of the proper sentence for federal offenses."  United States v.

Cage, 451 F.3d at 593 (internal quotation marks omitted).  They also help to prevent unwarranted

---

[12]The Court finds this explanation confusing.  If the United States believed that there were two samples involved (one mixture and one pure), it should have calculated the sentence by adding the two quantities of methamphetamine.  The PSR and the United States both overlooked the relevant Guideline provision, U.S.S.G. § 2D1.1(c), but their oversight was unrelated to the DEA's decision to combine both samples into one bag and the PSR's statement of the total weight of methamphetamine.

sentencing disparities across the nation's ninety-four judicial districts.  See United States v. Nolf, 30 F. Supp. 3d at 1226.

Second, and most important here, the Guidelines remain the "framework for sentencing," and all district court sentencing proceedings must begin with the correct calculation of the Guidelines range.  Peugh v. United States, 133 S. Ct. 2072, 2083 (2013)(Sotomayor, J.).  See Gall v. United States, 552 U.S. at 49-50 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  "While the Supreme Court's decision in *United States v. Booker* has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence."  United States v. Ornelas-Yanez, 77 F. Supp. 3d 1083, 1100 (D.N.M. 2014)(Browning, J.).  The calculation of the Guidelines range must include a proper calculation of the base offense level.  See U.S.S.G. § 1B1.1.  Flaws in the base offense level calculation, like the Court's failure to apply the greater offense level, are reversible procedural error even after United States v. Booker.  See United States v. Gigley, 213 F.3d at 519; United States v. Dighera, 2006 WL 1302139, at *2.  In short, the Court's use of the mixture weight measurement was error because it was inconsistent with the Guidelines.   Under Kimbrough v. United States, 552 U.S. at 90-91, the Court could, in a case without a departure under § 5K1.1, disagree with the Guidelines rule on the appropriate weight measure and vary downwards accordingly.  If the Court failed to calculate the Guidelines range before varying, however, its decision would still be procedural error.

### B.    THE COURT CANNOT REVISIT ITS USE OF THE WEIGHT OF THE MIXTURE OF METHAMPHETAMINE.

The Court has no authority to correct its weight measure error under 18 U.S.C. § 3582(c)(2) and U.S.S.G. § 1B1.10(b)(1).  It thus rejects the United States' argument that there

has been no change in the Guidelines range applicable to Tarango.  See Initial Response ¶ 16, at 8.

The relevant Guidelines instruct the Court to "determine the amended guideline range that would have been applicable to the defendant," but requires that it "substitute only the amendments listed in subsection (d) for the corresponding guideline provisions that were applied when the defendant was sentenced," leaving "all other guideline application decisions unaffected."   U.S.S.G.  1B1.10(b)(1)(emphasis added).   The United States argues that determining the amended guideline range allows the Court to recalculate the sentence and correct its past mistakes.  Initial Response ¶ 13, at 7.  Tarango, on the other hand, argues that the Court's choice of the mixture weight is a "guideline application decision[]" that the courts must leave intact.  June Reply at 4.

Tarango has the stronger argument, for two reasons.  First, the Supreme Court has held that "Section 3582(c)'s text, together with its narrow scope, shows that Congress intended to authorize only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding."  Dillon v. United States, 560 U.S. at 826 (rejecting challenge to sentencing court's erroneous application of the Guidelines as mandatory).  Tarango waived his right to appeal "any sentence within the applicable guideline range as calculated by the Court" and has not otherwise challenged the Court's sentence.  Plea Agreement ¶ 13, at 9.  The United States agreed not to oppose any sentence within the Court's discretion.  Pre-Hearing Response at 6.  The Court will not attempt to expand the scope of Section 3582(c) beyond that "limited adjustment" to permit either party to "collaterally attack[] [Tarango's] original sentence" on the grounds of a miscalculation.  United States v. Burkins, 596 F. App'x at 690.  Such an attack would be "a brand new direct appeal, something utterly at odds with the limited and streamlined eligibility

determination envisioned in § 3582(c)(2), U.S.S.G. § 1B1.10, and *Dillon.*"   United States v. Washington, 759 F.3d at 1185.

Second, the Tenth Circuit's subsequent decisions, however, show that United States v. Battle is not applicable to these facts.  Here, as in United States v. Burkins, the district court made a specific finding on drug quantity.  See 596 F. App'x at 690 n.6 ("Unlike in *Battle,* the sentencing court in Burkins' case made a specific finding of 8.88 kilograms. As such, the court's holding in *Battle* is not applicable to this case.").  Like the sentencing court in United States v. Vann, the Court "made a specific, determinate finding."  United States v. Vann, 593 F. App'x at 786-87.  See First Hearing Tr. at 111:9-10 (Court)(stating that Tarango's offense involved "a conspiracy to distribute 1.289 kilograms of a mixture and substance containing methamphetamine.").  The limited exception for indeterminate drug quantities is irrelevant here.

The Court's conclusion means that the new Amendments lowered both Tarango's base offense level and his Guidelines range.  District courts can reduce terms of imprisonment under § 3582(c)(2) to the extent that the "sentencing range subsequently has been lowered by the Sentencing Commission."  United States v. Sharkey, 543 F.3d 1236, 1237-38 (10th Cir. 2008)(Briscoe, J.).  These facts make him eligible for a reduction in his sentence under the statute and the Guidelines.  See 18 U.S.C. § 3582(c)(2)(limiting authorized reductions to those consistent with Sentencing Commission policy statements); U.S.S.G. § 1B1.10(a)(2)(B) (policy statement authorizing retroactive reductions).

**C.**   [REDACTED].

## II.   THE COURT HAS SIGNIFICANT RESERVATIONS ABOUT THE RETROACTIVE APPLICATION OF AMENDMENT 782.

To decide whether it will reduce Tarango's sentence, the Court must first determine why Congress and the Sentencing Commission have given the Court this task.  It must then decide

whether it can decline to give a new sentence and, if so, whether it should decline the opportunity. The Court concludes that, although it substantively disagrees with the Sentencing Commission and Congress' decision, the Court should not allow its personal preferences to override the will of the people expressed through its political, elected representatives.[13] Accordingly, the Court will defer to the political branches' expression of public policy.

### A. THE COURT IS NOT CONVINCED THAT THE 2012 SENTENCING GUIDELINES IT APPLIED TO TARANGO WERE TOO HARSH.

The Court believes that the Sentencing Commission acted rationally and reasonably when it set the Guidelines which the Court applied to Tarango in 2012. In United States v. Reyes, the Court stated that "Congress' goal was to end the kingpins' business, and one way to do that is to harshly punish, not only the kingpins, but also those who carry out their business. Accordingly, Congress prescribed a higher minimum sentence than an individual defendant's culpability, standing alone, might warrant." 9 F. Supp. 3d at 1225. The Court thus has no Kimbrough disagreement with the Guidelines which existed when it sentenced Tarango in 2012.

As the Court stated in United States v. Reyes, it also has no Kimbrough disagreement with the Sentencing Commission's decision to lower the Guidelines in 2014:

---

[13]In the past, the Court has warned that federal courts must be cautious about making wholesale criticism of a major Congressional policy initiative. See United States v. Reyes, 9 F. Supp. 3d at 1218-19. The Court stands by those remarks. The Court has consistently refrained from criticizing the Sentencing Commission's 2-level reduction for defendants being sentenced for the first time; those defendants must be sentenced, and the Sentencing Commission's actions impose minimal impact on the courts. The Court is more critical of the onerous task of re-examining many sentences it has already given. It finds it legitimate to point out the burdens that the political branches are imposing on the federal courts. While the Court would not call the retroactivity provision a mistake -- "unless the mistake is of constitutional dimension, i.e., the statute is inconsistent with the Constitution, it is hard for a Court to say that Congress, the elected branch of our government, ever makes a 'mistake'" -- the Court can detail the burdens Congress is imposing on the courts. United States v. Reyes, 9 F. Supp. 3d at 1216-17.

It is worth noting what the Commission has proposed to do in its proposed amendments to § 2D1.1 of the Guideline -- and what it has not done. The Commission is considering lowering the "Drug Quantity Table so that the quantities that trigger the statutory mandatory minimum penalties trigger base offense levels 24 and 30, rather than 26 and 32." Proposed Amendments at 35. Doing so will "establish guideline ranges with a lower limit below, and an upper limit above, the statutory minimum." Proposed Amendments at 35. The Commission's original ranges set the Guideline ranges slightly higher than the mandatory minimums to allow judges to adjust downward for a cooperating defendant. *See* Proposed Amendments at 33. The Commission's comments on its proposed amendments underscore the proposal's purpose: to incorporate Congress' mandatory minimums correctly, but also to reconcile those mandatory minimums with numerous intervening changes in drug policy -- most significantly, the multiplication of sentencing enhancements and downward adjustments, and the effects of the safety valve on plea bargaining. *See* Proposed Amendments at 33–34. Perhaps most importantly, it did not take the unscientific approach that Judge Gleeson suggests [in <u>United States v. Diaz</u>, No. 11-CR-00821-2 JG, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013)]: immediately slashing the Guideline ranges by a third. In this sense, the Commission appears to firmly grasp its role in constructing a sentencing regime that respects congressional intent.

9 F. Supp. 3d at 1237.

The Court disagrees, however, with the Sentencing Commission and Congress' decision to make the Amendment 782 retroactive. The Court objects to revisiting sentences it worked hard to craft years earlier. It does not make sense to arrive at a sentence that accurately reflects the 3553(a) factors, only to discard it several years later. The retroactive rule also treats criminal defendants as a class rather than considering the factors in each case, turning <u>United States v. Booker</u> on its head just for the defendants' benefit. While many criticize the federal courts for "mass incarceration," surely this phrase is a hyperbole, or at least a poor shorthand for the problem being addressed; there is no "mass incarceration" -- each defendant was separately convicted and sentenced, one at a time.

There does not seem to be a recognition of how much burden the retroactive application of Amendment 782 puts on the Court. The retroactive application in most instances creates more

than just duplicative work for the Court.  The Court must take the time to re-educate itself on how it arrived at the sentence ultimately imposed, which includes taking into account any objections lodged, the departures requested, the variance arguments asserted, and the 3553(a) factors considered in arriving at the original sentence.   For instance, in this matter, the Presentence Report totals fifty pages -- not including the Plea Agreement; the United States Probation Office generated three Addendums totaling forty-two pages.  The parties' briefing regarding the sentencing memoranda and objections to the Presentence Report totaled almost one hundred pages -- ninety-two to be precise.  The original sentencing hearing January 31, 2012 lasted four hours.  The August 26, 2015 sentence reduction hearing required another hour.  In considering a motion for reduction in any case, moreover, the Court is at a minimum going to at least peruse the materials available at the time of sentencing.  For Tarango, a conservative estimate for how long it took the Court to prepare for and conduct the sentence reduction hearing is probably in the range of seven to eight hours.  And then writing the opinion has taken at least portions of seven days.  One can reasonably argue that the Tarango sentencing proceedings were more excessive than the normal sentencing proceeding that the Court conducts, but it is not unreasonable to expect that each potential sentence reduction matter will take the Court two to four hours to resolve -- whether it be purely upon the papers, or including a hearing and any necessary written work required as a result.  This problem requires other work to be compressed or dealt with on extended work days and hours -- and, even delayed.  And this is all for a defendant who trafficked drugs, corrupted a police officer, and fled to Mexico.

Other courts and commentators share at least some of the Court's concerns.   The Honorable Royce C. Lamberth, United States District Judge for the District of the District of

Columbia, has expressed hesitation about the changes.[14]   The <u>Washington Post</u> reported, in an article titled "U.S. judge pauses at cutting sentence of D.C. drug lord's associate":

> A move to lower the lengthy prison sentence of a top associate of one of Washington's most notorious drug lords has prompted a federal judge to ask whether the nation's nascent drive to reduce prison populations might already be going too far.
>
> U.S. District Judge Royce C. Lamberth expressed doubt last week about cutting two years off the 28$^1/_2$-year prison term of Melvin D. Butler, the Los Angeles-based broker for D.C. cocaine king Rayful Edmond III, whose trafficking network employed more than 150 people and imported as much as 1,700 pounds of Colombian cocaine a month into the city in the 1980s.
>
> "It still gives me pause what Congress is doing," said Lamberth . . . who was chief judge of the district court from 2008 to 2013. "I would have thought the top drug kingpins in the country would not be the beneficiaries of what we're trying to do here. Am I wrong?"
>
> \* \* \* \*
>
> Some conservative legal experts welcomed Lamberth's doubts, warning that "the culture is losing its nerve" and turning excessively critical of police and discounting the role of harsh sentences in winning the fight against crime, as William G. Otis, a former federal prosecutor . . . , put it.
>
> "If we cut back on the increased use of incarceration, we're going to get more crime, and I think we're already seeing that . . . right under our nose in D.C.," said Otis, adjunct professor of law at Georgetown University. "If we go back and just walk away from what we undertook to reduce crime, we're going to go back to where we were."

Spencer Hsu and Julie Zauzmer, <u>U.S. judge pauses at cutting sentence of D.C. drug lord's associate</u>, WASH. POST (Sept. 6, 2015), https://goo.gl/2h3VpD ("Washington Post Article").   <u>See</u> Carrie Johnson, <u>Notorious Cocaine Dealers' Release Requests Test New Sentencing Guidelines</u>, NAT. PUBLIC RADIO (Aug. 31, 2015), http://goo.gl/fMElBh ("Butler had initially been sentenced to life in prison . . . [b]ut the judge who presided over the case, and died in 1997, later reduced

---

[14]   The Court respectfully disagrees with Judge Lamberth on the underlying logic of Amendment 788, but shares many of his concerns about its indiscriminate application.   <u>See</u> United States v. Butler, No. Crim. 89-162-2RCL (D.D.C. Sep. 16, 2015).

the sentence.")("NPR Article"); <u>id</u>. ("Judge Lamberth . . . recalled Edmond testifying that many of his lieutenants wielded firearms. Lamberth also asked about an apparently unresolved murder allegation involving Jones dating to the 1980s.").  The Assistant United States Attorney in that case voiced similar concerns:

> Prosecutor Barry Wiegand said he didn't want to opine about changes in criminal justice policy.  But he said he lived several blocks away from what used to be a drug market under Edmond's control.

> "I wouldn't presume as an assistant United States attorney to be privy to the wisdom of Congress," he said. . . . What we did in the 1980s and 1990s was the right thing to do, and we did it well."

NPR Article.

The Sentencing Commission's public statements described the move as "an important start toward addressing the problem of over-incarceration at the federal level."  Press Release, U.S. Sentencing Comm'n, Comment of Honorable Patti B. Saris, Chair, U.S. Sentencing Commission, on Amendment Reducing Drug Guidelines Becoming Effective Tomorrow (Oct. 31, 2014)(http://goo.gl/NSE9HI).  Some members of Congress and attorneys objected to the Sentencing Commission's plan to make 46,000 felons retroactively eligible for sentence reductions.  Representative Bob Goodlatte and Senator Chuck Grassley authored a letter warning that early release groups would include "inmates with violent criminal histories."  Letter from Bob Goodlatte and Chuck Grassley, Chairs of the House and Senate Judiciary Committees, to the Hon. Loretta Lynch, Attorney General (July 21, 2015)(http://goo.gl/KN5FaK).  The National Association of Assistant United States Attorneys submitted a letter citing to various Bureau of Justice Statistics studies, including one 2014 article suggesting that 76.6 percent of all drug offenders were re-arrested within five years of their release from imprisonment.  <u>See</u> Letter from Dennis Boyd, Exec. Director, National Association of Assistant United States Attorneys, to the

Hon. Patti B. Saris, Chair, United States Sentencing Comm'n at 1-2 (July 2, 2014)(http://goo.gl/PPsNcr)("AUSA Letter").  It also attacked the specific populations eligible for reductions, noting that over twenty percent "received a 'weapons specific offense characteristic,' ten percent received a 'firearms mandatory minimum' sentence, and fifteen percent received an 'aggravating role' adjustment."  AUSA Letter at 2.  It challenged the supposed cost savings from the reductions, pointing out the "costs associated with processing the over 50,000 applications by the Department of Justice and the court system" in addition to the costs associated with "the fact that at least 50 percent of these offenders will likely have to be rearrested and prosecuted for committing new crimes."  AUSA Letter at 2.

Even the Department of Justice recommended limits on Amendment 788.  At the Sentencing Commission's public hearing for Amendment 788 on June 10, 2014, the Department of Justice urged that retroactive application of the Guidelines should be "rare" and "limited to lower-level non-violent drug offenders without significant criminal histories."  Sally Quillian Yates, U.S. Att'y, N. Dist. Ga., Statement Before U.S. Sentencing Commission in the Public Hearing on Retroactive Application of 2014 Drug Guidelines Amendment 111-115 (June 10, 2014)(transcript available at http://www.ussc.gov/videos/public-hearing-june-10-2014)("Yates Testimony").  It added that retroactivity should be restricted "to a class of non-violent offenders who have limited criminal history, that did not possess or use a weapon and this will only apply to the category of drug offender who warrants a less severe sentence."  Yates Testimony at 117. Amendment 788 did not include any of these categorical bars.

**B.  THE COURT IS NOT SOUNDLY CONVINCED THAT CRIME IS DECLINING AS MUCH AS MANY PEOPLE PERCEIVE, OR THAT, IF CRIME IS DECLINING, THE PROPONENTS OF PRISON POPULATION REDUCTION HAVE IDENTIFIED THE RIGHT REASONS FOR THE DECLINE.**

Everywhere one turns, one can see a judge, sentencing commission, Attorney General, Senator, Representative, academic, or layperson talk about the high costs of imprisonment, overcrowded prisons, and the need to have fewer people in prisons and jails.[15]  Conservatives and libertarians have joined liberals in these calls for reductions in incarceration.  There is particular pressure on the Sentencing Commission to release prisoners early by lowering ranges and making them retroactive.

The Court knows that its thinking contravenes conventional wisdom, but it believes that the nation needs more prisons and jails, not fewer.  While the nation's Guidelines ranges must always be reviewed, adjusted, and improved to reflect the goals of sentencing, calls for fewer inmates at lower sentences seem, at times, to be driven by philosophical and ideological reasons rather than by whether they meet the goals of sentencing that Congress -- as the Legislative branch of our nation's government -- has established through § 3553(a).  The Court is cautious

---

[15]See, e.g., Michelle Alexander, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (2010); Jed S. Rakoff, Mass Incarceration: The Silence of the Judges, THE NEW YORK REVIEW OF BOOKS (May 21, 2015), http://goo.gl/x1Yig9; Michael Tonry ed., Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research, at 28-29 (2006); Gerard E. Lynch, Ending Mass Incarceration: Some Observations and Responses to Professor Tonry, 13 Criminology and Public Policy 561 (Nov. 2014); Sari Horwitz, Unlikely Allies: A Bipartisan Push for Sentencing Reform Unites President Obama and the Koch Brothers, but Many are Still Waiting Behind Bars, WASH. POST (Aug. 15, 2015), http://goo.gl/UDQjP2; Bryan Tau, Obama Decries "Mass Incarceration" in Call for Prisons Overhaul, WALL ST. J. (July 14, 2015), http://goo.gl/JVK48b.

and skeptical about goals of decreasing the prison population and reducing sentences just for the sake of punishing fewer people.

First, while the consensus among scholars holds that crime rates are declining -- and the Court does not question that rates are declining -- it does not, from the Court's vantage point, appear that crime is becoming rare. The District of New Mexico has more criminal felony filings than any other District within the Tenth Circuit. See ADMINISTRATIVE OFFICE OF THE U.S. COURTS, TABLE N/A -- U.S. DISTRICT COURTS -- COMBINED CIVIL AND CRIMINAL FEDERAL COURT MANAGEMENT STATISTICS at 81 (December 2014)("Combined Management Statistics"). It has experienced substantial increases in criminal filings over the last three years. See DEPARTMENT OF JUSTICE, UNITED STATES ATTORNEYS' ANNUAL STATISTICAL REPORT at 3 (2014), 50 (2013), 28 (2012). The District's numbers are at their highest level since at least 2010. See Combined Management Statistics at 81. Crime in Albuquerque has been "steadily rising over the past four years." Nicole Perez and Robert Browman, ABQ's Crime Increased in 2014, ALBUQUERQUE JOURNAL (Sep. 30, 2015), http://goo.gl/IHY1OX. The overcrowding in the nation's jails and prisons undermines the significance of the fact that crime is declining. While crime rates may be declining, the population is growing, and crime remains widespread.

The Washington Post noted that Judge Lamberth's comments came "amid a surge of violent crime this summer that has lifted murder rates. . . . The crime spike has prompted elected officials and police chiefs to calibrate their support for ending mass incarceration practices, saying repeat offenders are responsible for some of the recent violence." Washington Post Article. See id. ("[D]ozens of U.S. cities this year are reporting an uptick in violence."); id. ("The District has recorded 105 homicides so far this year, well above the modern low of 88 in all of 2012 . . . ."); id. (quoting D.C. Police Chief Cathy L. Lanier: "We are seeing far too many

- 47 -

of our repeat violent offenders out here being reckless with firearms over and over again . . . . There is a push to release a lot of people."); Will Greenberg, <u>Police chiefs from around the country meet in D.C. to discuss violent summer</u>, W<span style="font-variant:small-caps">ASH</span>. P<span style="font-variant:small-caps">OST</span> (Aug. 3, 2015), https://goo.gl/EE03OJ.

Second, even if we assume -- as we must -- that crime rates are generally dropping, we must ask why.  Some have given credit to the Guidelines and the increase in the federal prison population.  <u>See</u> AUSA Letter at 3 ("The strong sentencing scheme that has been in place over the last 25 years in our country has contributed to the lowest crime rates in more than a generation.").[16]  If that is where credit is currently due, it may not make sense to elevate the goal of reducing prison populations at the expense of other § 3553(a) factors.  <u>See</u> Washington Post Article (explaining that the recidivism rates of inmates set free in an earlier round of reductions were roughly equal to the rates for inmates who served the full term, and that both were over forty percent).

### C.   THE COURT DOES NOT BELIEVE THAT THE LAWS IT ENFORCES -- PASSED BY THE POLITICAL BRANCHES -- ARE ILLEGITIMATE.

One of the reasons -- and perhaps the primary reason -- that there is such pressure to decrease the prison population is not that there is less crime, but that some people believe that many of the nation's crimes should not be crimes at all, or should be punished much less severely.  The Court objects to this broader criticism from certain politicians and pundits that the justice system is fundamentally flawed.  The United States is not a modern South Africa and not

---

[16]Even organizations convinced that the "criminal justice system is in desperate need of reform" concede that there is at least some relationship between increases in the prison population and reductions in crime.  The Marshall Project, <u>Mission Statement</u> (available at https://goo.gl/G9sO7A); Dana Goldstein, The Marshall Project, <u>10 (Not Entirely Crazy) Theories Explaining the Great Crime Decline</u> (Nov. 24, 2014)(<u>available at</u> https://goo.gl/zgGyt9)(allowing that "mass incarceration accounted for about 10 to 20 percent of the overall crime drop since 1992").

everyone in the federal prisons is a political prisoner.  A judicial system can always be improved, but to blast the greatest judicial system that the world has ever seen as unjust is inaccurate and unfair.  Leonard Pitts for example, wrote a particularly over-the-top editorial reprinted in the Albuquerque Journal, titled "It's time to turn American 'injustice' system around."  Leonard Pitts, Editorial, A justice system worthy of the name, MIAMI HERALD (July 21, 2015), http://goo.gl/KEUCWS,   reprinted in ALBUQUERQUE JOURNAL (July 23, 2015), http://goo.gl/J2BdyB ("Pitts Editorial").  His first line is: "The United States does not have a justice system."  Pitts Editorial.  President Obama has been a little softer: "Any system that allows us to turn a blind-eye to the hopelessness of despair, that's not a justice system, that's an injustice system."  Pitts Editorial.  Pitts criticizes "the mass incarceration by race and class of hundreds of thousands of nonviolent offenders."  Pitts Editorial.  But the judicial system does not incarcerate anyone by race or class; it does not incarcerate thousands of defendants at any one time.  It incarcerates individuals, one at a time.  To focus too much on results rather than the process is unfair to a system that focuses on procedural fairness, and does not try to reach a preordained result or goal.  If the procedure is fair, the Court is less concerned whether there is an acquittal or a conviction.

Pitts says that "the veil separating drug offender from productive citizen is thinner than we sometimes like to admit."  Pitts Editorial.  But as someone who spends his life daily with "drug offenders," the Court is not as convinced.  To be sure, judges tend to see only failures, not the successes.  But people who sell drugs to make money tend to violate other laws, and people who sell drugs because they are addicts have an extremely hard time overcoming their addictions.

The nation's drug trafficking laws receive the greatest criticism.  Critics characterize most of the traffickers as couriers or drug addicts selling drugs to feed their habits.  These critics often try to leave the impression that the nation is imprisoning large numbers of people for mere possession of marijuana.  Unsurprisingly, people who have substance abuse problems frequently traffic drugs.  There are couriers, but not all couriers are created equal.  Some simply pick up a bag and get on a bus to Chicago for $500.00, and do not know what they are carrying; some arrange or supply the car, know what drugs they are carrying, know the names of a number of people at both ends, travel with another person or another vehicle, and make multiple trips for $1,500.00.  The Court has never sentenced a defendant to more than time served for mere drug possession, and it seems unlikely that there are thousands of people in prison -- particularly federal prison -- for marijuana possession alone.[17]   Moreover, the United States is not prosecuting many pure marijuana cases unless the money is going to the drug cartels.  The Court has pursued a life of public service and worked to provide justice tailored to the facts of each case before it for more than a decade.  The nation's political elites should respect that effort by refraining from making unsubstantiated claims that federal prisoners are largely political prisoners.

---

[17]The White House Office of National Drug Control Policy currently explains that "simply stated, there are very few people in state or Federal prison for marijuana-related crimes . . . [T]he vast majority (99.8 percent) of Federal prisoners sentenced for drug offenses were incarcerated for drug trafficking." Office of National Drug Control Policy, Answers to Frequently Asked Questions about Marijuana (available at https://goo.gl/X6XGSf)(citing Bureau of Justice Statistics, Federal Justice Statistics 2009 - Statistical Tables (Revised 2012)).  See Johnathan P. Caulkins, Angela Hawken, Beau Kilmer, and Mark A.R. Kleiman, MARIJUANA LEGALIZATION: WHAT EVERYONE NEEDS TO KNOW 50 (2012)("[L]ess than 1 percent of state and federal inmates are serving time for marijuana possession alone -- and in many of those cases, the possession conviction was the result of a plea bargain involving the dismissal of more serious charges.").

If the nation wants to legalize drug possession and trafficking, that is a political decision. But the critics of the incarceration of drug traffickers should be more honest.  Even the most liberal or libertarian pundits do not usually suggest that people who deal cocaine, methamphetamines, and heroin should not be prosecuted.  Moreover, most of those who want to legalize marijuana do not suggest that it should be unregulated; indeed, most want to regulate legalized drugs extensively to generate tax revenues, ensure that minors do not use the drugs, prevent driving under the influence, and monitor drug purity to ensure that drugs do not kill their users.  People who sell illegal drugs, as well as legal drugs illegally, will still be criminally prosecuted.  The government will pursue those who obtain marijuana illegally from Mexico, sell to children, sell to those about to drive, sell impure drugs, or dodge taxes.  New York City, for example, aggressively prosecutes those who bypass its regulatory scheme by selling smuggled cigarettes.  Even if all drugs were legalized tomorrow, the nation's courts would still send defendants to prison for selling illegal drugs, for selling legal drugs that do not conform to regulations, or for illegally reselling legal drugs.

Elitist critics have also scorned the federal courts for sentencing undocumented aliens. They advance images of fathers with families carrying their small children over the Rio Grande to find work in the United States.  They argue that federal judges are harsh and unsympathetic for sending these people to prison and breaking up families.  But this stereotypical idealism is now largely inaccurate.  While the immigration from Honduras, Guatemala, and El Salvador in the summer of 2014 may make it appear that it is very easy for women and children to cross our borders, that asylum-seeking was highly unusual.  Crossing the border is very difficult and is largely being done by men.  Roughly 96.8 percent of defendants charged with illegal re-entry are men.  See U.S. EXECUTIVE OFFICE OF IMMIGRATION REVIEW, ILLEGAL REENTRY OFFENSES at 8

(April 2015)(describing Fiscal Year 2013)("Re-Entry Report").

Moreover, while many come for work, others come to commit crimes; some who come for work engage in criminal activity when they arrive in the United States.  Because the United States generally does not produce the methamphetamine, heroin, and cocaine that United States customers seek, most of these drugs arrive across the southern border.[18]  Many of the people crossing that border are both entering illegally and carrying drugs.  Of many charged with illegal re-entry, roughly ninety-two percent "had at least one prior conviction for a non-traffic offense." Re-Entry Report at 16.  The ninety-two percent with prior convictions had an average of 4.4 prior convictions per offender and a median of three prior convictions.  Re-Entry Report at 16. Some of these crimes were serious and violent.

Last week, the Court sentenced Juan Rodriguez-Moreno.  See United States v. Rodriguez-Moreno, No. 15 Cr. 2582JB (D.N.M. Sep. 23, 2015)(Browning, J.).  This case was his fifth felony immigration offense.  He also had one conviction for immodest exposure; one for disturbing the peace; twenty-eight citations for trespassing; ten citations for alcoholic liquor in public places; twenty citations for shoplifting; thirty citations for drunkenness; eleven citations for interference with officers; six more citations for disturbing the peace; three citations for

---

[18]See, e.g., Drug Trafficking Violence in Mexico: Implications for the United States: Statement Before the U.S. Senate Caucus on International Narcotics Control, 11th Cong. 1855 (May 5, 2010)(statement of Anthony P. Placido, Assistant Administrator for Intelligence, Drug Enforcement Administration and Kevin L. Perkins, Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation):

> The Southwest border (SWB) of the United States is the principal arrival zone for most of the illicit drugs smuggled into the United States, as well as the predominant staging area for the drugs' subsequent distribution throughout the country. According to El Paso Intelligence Center (EPIC) drug seizure data, most of the cocaine, foreign-source marijuana and methamphetamine, and Mexican-source heroin available in the United States is smuggled into the country across the SWB.

disorderly conduct; three charges for concealing identity; and one citation for failure to pay fines. See Presentence Investigation Report at 6-8 (disclosed Aug. 4, 2015). Even then, the United States entered a Fast Track plea agreement with Rodriguez-Moreno, reducing his sentence as much as Congress allows under an expedited plea process.

The United States needs to regulate immigration for security purposes, even if it allows relatively open borders. See James O. Browning & Jason P. Kerkmans, A Border Trial Judge Looks at Immigration: Heeding the Call to Do Principled Justice to the Alien Without Getting Bogged Down in Partisan Politics: Why the U.S. Immigration Laws Are Not Broken (but Could Use Some Repairs, 25 U. Fla. J.L. & Pub. Pol'y 223, 235 (2014)("Immigration Article"). If the most comprehensive immigration bill possible cleared the Senate, the next day, the federal courts would still go to work and sentence people for illegal re-entry. Immigration Article at 278 ("On the morning after a pathway to citizenship bill is passed, all the criminal laws that federal judges apply every day will still be in place."). The Court is unfairly accused of imprisoning the poor and downtrodden -- "political prisoners" -- when immigration regulation that is intended to keep the bad out will not go away even with comprehensive immigration reform.

In short, drugs and illegal re-entry make up a large percentage of the District's docket and the national docket.     In 2012, for example, immigration and drug offenses made up 63 percent of all federal convictions. See PEW RESEARCH CENTER, FEDERAL CONVICTIONS BY OFFENSE TYPE, 2012 at 1 (March 2014). When the nation's political elites argue that most of what the federal courts do is illegitimate and should not be done at all, they unnecessarily undermine the nation's confidence in the federal judiciary at a time when its courts are dispensing substantive and procedural justice on an unprecedented scale.

The Court encounters similar criticisms with American Indian country cases.  Many people think it is unseemly for a federal court in Albuquerque, New Mexico -- off the reservation -- to summon people here rather than let the tribal courts deal with crimes on the reservation. Not only do the tribal courts lack jurisdiction over most of the crimes, however, but the tribal courts often fail to sentence these criminal defendants heavily or at all when they can.  The Court wakes up every morning thinking its work protects American Indian communities from people who commit murders and assaults, women from domestic violence, children from sexual abuse, and the community at large from intoxicated drivers.  Some political elites, however, view the federal courts as imposing Anglo will on American Indians and violating American Indian sovereignty.  Again, this idea that convicted American Indians are political prisoners makes the Court's difficult job less fulfilling and, again undermines the nation's faith in its courts.

One more example should suffice to make the point: child pornography.  Many libertarians view this crime as a less serious offense unworthy of the sentences that Congress has required, the Sentencing Commission recommends, and the federal courts impose.  While the Court goes off to work thinking it is protecting children, some believe the Court is severely punishing something little worse than dirty pictures.

Cries for the Court to focus on rehabilitation and treatment instead of incarceration similarly miss the point.  It remains illegal for the court to incarcerate someone for rehabilitative purposes.  See 18 U.S.C. § 3582(a) ("[I]mprisonment is not an appropriate means of promoting correction and rehabilitation."); Tapia v. United States, 131 S. Ct. 2382, 2391 (2011)(Kagan, J.)("Section 3582(a) precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation.").  The Court cannot, should not, and does not make a sentence longer so that the defendant can sober up, get drugs out of his or her system, or go

through withdrawal.  Thus, the defendants in federal prison are not there for rehabilitation, but because their incarceration advances other § 3553(a) factors -- recognizing the severity of the offense, promoting respect for the law, deterring criminal conduct, and protecting the public.

In sum, the Court is not convinced that the nation should de-populate its prisons.  Cost savings are not an adequate reason to make radical changes to current sentencing practices.[19]

---

[19]The Court addressed a similar issue in <u>United States v. Reyes</u>.  While it is certainly appropriate for Congress and, because of a statutory delegation, the Sentencing Commission to consider the costs of incarceration, it is not one of the § 3553(a) factors, and thus should play no role in the already difficult task of coming up with an appropriate sentence for a particular defendant.

> Congress is much better equipped than the federal courts to balance the expense of the nation's prison system with the necessity of incarcerating particular offenders. Prison over-crowding -- or under-building -- may be a real problem, but Judge Gleeson's approach would have the drug-trafficking-sentencing tail wag the prison-spending dog. Congress can solve this problem better than judges can, and the federal courts do not improve matters by introducing sentencing chaos into the mix of issues that Congress must resolve in deciding how much of the nation's treasure to devote to the prison system.

> It intrigues the Court when judges cite saving taxpayer dollars as a reason to give lower sentences. As far as the Court can see, saving taxpayer dollars is not one of the § 3553(a) factors. It is possible that creative judges and lawyers can squeeze saving taxpayer dollars into "the kinds of sentences available" or some other sentencing factor, but the more reasonable explanation is that, if Congress wanted judges to be concerned about saving taxpayer dollars, it would have explicitly mentioned that factor. More likely, Congress probably thought that sentencing and balancing the explicit § 3553(a) factors is hard enough without the judge having to worry about what imprisonment or supervision will cost. Moreover, it is likely that Congress does not want judges to worry about the costs of incarceration and supervision; if a defendant needs to be incarcerated or supervised, Congress probably wants judges to incarcerate or supervise, and not reduce the sentence because of costs. Hence, while judges are qualified to criticize mandatory minimum sentences as costing too much, the argument is not legitimate. Congress and the people do not want judges to worry about costs when trying to determine what the appropriate sentence is for an individual defendant. Congress -- and many states -- may rather build more prisons than eliminate mandatory minimums. In the end, the question how to allocate the nation's resources is a legislative task and not a judicial task.

There may be good reasons to reduce prison levels, but the critics of current incarceration rates have failed to raise them.

> **D.      DESPITE CONCERNS ABOUT THE BURDEN THAT THE RETROACTIVE APPLICATION OF AMENDMENT 782 IMPOSES ON THE FEDERAL COURTS, THE COURT WILL DEFER TO THE POLITICAL WILL EXPRESSED IN THE AMENDMENTS AND LOWER TARANGO'S SENTENCE.**

While the Court has reservations about the wisdom of Congress' decision to allow the retroactive application of the 2-level downward departure of people who are already sentenced and incarcerated, it nonetheless thinks it has a duty, as an unelected judicial officer, to give the political will the highest deference when constitutionally and legally possible.  Although the Court has concerns similar to those that Judge Lamberth has expressed, and wonders about the wisdom of giving someone like Tarango -- who dealt drugs, corrupted police officers, and fled to

---

Also, in light of the enormity of our nation's budget, it is somewhat humorous to watch judges tilt their sentencing-cost lances in individual cases at the prison-cost windmill.  In the proposed budget that the Obama Administration submitted for the fiscal year 2013, it allocated to the Bureau of Prisons less than $7 billion out of a proposed budget of approximately $3.8 trillion. *See* Fiscal Year 2013 Budget of the U.S. Government <u>available at</u> 140, 214 http://www.whitehouse.gov/sites/default/files/omb/budget/fy2013/assets/budget.pdf.  In other words, even if the Administration got everything it asked for, the entire Bureau of Prisons would consume less than .002% of the federal budget.  Granted, of the federal budget.  Granted, other agencies spend money that relates to sentencing, but the point remains: all of this judicial handwringing is over a small percentage of the national budget.  Moreover, the nation is borrowing about forty cents of every dollar it spends.  While the public probably would appreciate any federal entity that would give any thought to saving taxpayer dollars, the concern is relatively insignificant in the scheme of things, and it is a concern that Congress does not appear to want the courts to spend a lot of time or effort addressing when it is trying to come up with an appropriate sentence for an individual defendant.  In sum, this argument is makeweight and weak.  While the ADAA's mandatory minimums and the related increases in the Guideline range for drug trafficking have, no doubt, increased the federal prison population some, that marginal increase is not among the factors that the Court should properly consider in sentencing an individual defendant.

9 F. Supp. 3d at 1238-39.

Mexico -- any break now, he appears to fall within the class of defendants that the Sentencing Commission had in mind for early release.  The Court is reluctant to ignore what the country apparently wants now.  The Court could probably refuse to let Tarango leave early under some of the § 3553(a) factors.  But such an act would be the exercise of raw judicial power, and inconsistent with a democratic form of government and the role that the federal courts play in our constitutional system.

Tarango has, by his conduct in prison, improved his position in society.  He has signaled that he is more prepared to reintegrate into society than he was at his 2012 sentencing hearing. The Court calculated an appropriate sentence for Tarango in 2012; Tarango has not done anything since then to make the Court believe that it was too low.  For the Court to refuse Tarango the 2-level reduction would thus be inconsistent with the Court's need to be sensitive to Congress' political will.

## III. THE COURT WILL REDUCE TARANGO'S SENTENCE TO FULLY REFLECT THE SENTENCING GUIDELINES' RANGE.

The Court concludes that it should reduce Tarango's sentence to 73-months' incarceration, because he has relatively clean prison disciplinary and education records, has maintained contact with his family, and has otherwise not upset the Court's original balance of § 3553(a) factors.  [REDACTED].

### A. THE CALCULATIONS DESCRIBED IN THE GUIDELINES AND A CONSIDERATION OF THE § 3553(a) FACTORS SUPPORT A 73-MONTH SENTENCE.

The Supreme Court has explained that "[a]t step two of the inquiry, § 3582(c)(2) instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case."  Dillon v. United States, 560 U.S. at 826-27.

The Court will first calculate the reduction authorized by § 3582(c)(2).  Its original 2012 sentence was 92 months.  <u>See</u> Sentencing Judgment at 2.  Given the Court's conclusion that it cannot correct its error in using the mixture weight to determine Tarango's base offense level, the Court will begin with a base offense level of 32.  After enhancements and departures, the resulting base level is [REDACTED].

The Court's previous decision to sentence Tarango near the bottom end of the post-departure Guidelines range would be reasonable with respect to the recalculated sentence.  The upward and downward pressures on the sentence largely remain the same.[20]  The Court originally counted [REDACTED] factors [REDACTED] that put downward pressure on the sentence.  First Hearing Tr. at 115:1-4 (Court).  These included: [REDACTED] (i) personal history of poverty, lack of education, and family troubles; (ii) "some innate good qualities," demonstrated by letters from those who knew him; (iii) positive plans for the future; (iv) strong family ties; and (v) lack of a documented criminal history.  First Hearing Tr. at 115:1-118:24 (Court).  The Court also listed six factors weighing against a variance.  These included: (i) lack of non-criminal employment; (ii) conscious decision to engage in criminal activity; (iii) the enormity of the crime and corruption of law enforcement officers; (iv) the ineffectiveness of

---

[20]Tarango cites the relatively insignificant benefit to him resulting from any reduction as a ground for a greater reduction.  <u>See</u> Second Hearing Tr. at 34:5-19 (Converse).  Defendants are often released to a Residential Reentry Center, generally known as a halfway house, for the final months of their terms.  <u>See</u> Memorandum from the Assistant Director of the Correctional Programs Division of the Bureau of Prisons to Regional Directors, Wardens, and Residential Reentry Managers (May 24, 2013).  Tarango's term is to end on April 3, 2016; he is eligible to go to a halfway house "sometime between October [2015] and January [2016]."  <u>See</u> Second Hearing Tr. at 31:1-4 (Converse).  The Court's decision will, thus, result in Tarango's release from his current facility only a few weeks or months earlier.  Tarango will still be at a halfway house, under all of its rules and security, which are sufficient to protect the public from any further criminal acts.

alternative sentences; (v) respect for the law in the community; and (vi) flight from arrest.  See First Hearing Tr. at 118:25-122:6 (Court).

Tarango has improved his situation since his sentencing in 2012.  He has continued to pursue his plans for the future and has mitigated some of the Court's concern about his lack of non-criminal employment by taking numerous re-entry courses, completing his GED from within prison, and working at a job off prison grounds.  See Prison Transcript and Certificates at 9-31; Support Letters at 4-8; Second Hearing Tr. at 42:20-22.  He has maintained a positive, close relationship with his children from inside prison, which often reduces recidivism.[21]  He has continued to support his half-sister through her studies.  See Support Letters at 4-8.

The United States has agreed not to object to any sentence within the Court's discretion. See Pre-Hearing Response at 6.  Although it notes that the defendant had three serious instances of charged misconduct in prison, it adds that there was a "lack of a consistent pattern."  See Pre-Hearing Response at 6-7.  The Court agrees with the United States that, given its ability to monitor Tarango on supervised release, he is less likely to be a threat to the public.  See Pre-Hearing Response at 6-7.  The conditions requiring that Tarango complete an outpatient substance abuse program, refrain from all contact with two of the co-defendants in this case, and not associate with anyone convicted of a felony without permission will further protect the

---

[21]Studies for the state prison system in the southern part of the state show that fathers who stay in contact with their children while they are in custody have a lower recidivism rate. See R. Romo, "Prison Program Will Expand, Father Helped in Southern Facility," Albuquerque Journal, at B3 (July 7, 2004)("When fathers who are incarcerated are connected to their children and their families, the inmates' chances of coming back [to prison] decrease.").  The best shot that the Court may have to rehabilitate Tarango, and keep him on the straight and narrow, may be to keep his relationship with his children intact and put him in a position to support them.  If Tarango has something to live and work for, he may not live a life of crime; a steady relationship may also keep his children from repeating this incarceration cycle.

public.  See Sentencing Judgment at 3.  The Court adds that a future court sentencing Tarango

for any subsequent offenses will likely be less inclined towards a shorter sentence.

[REDACTED].

      The Court concludes that, after applying the Sentencing Guidelines policies and

§ 3553(a) factors to Tarango's circumstances and the nature of his offense, that the imposition of

a sentence of 73 months is sufficient but not greater than necessary.  The Court finds that a

sentence of 73 months reflects the seriousness of Tarango's offense, promotes respect for the

law, provides just punishment, affords adequate deterrence, and protects the public. The Court

has also considered Tarango's post-sentencing conduct and does not believe that it precludes a

sentence at the low end of the amended Guidelines range.

      **IT IS ORDERED** that the Defendant's Motion to Reduce Sentence is granted.

Defendant Daniel Tarango's sentence is reduced to 73 months.  In accordance with U.S.S.G. §

1B1.10 cmt. app. n.1(B)(6), the effective date of this order will be November 1, 2015.


_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Damon P. Martinez
  United States Attorney
William Pflugrath
Reeve Swainston
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Kari Converse
   Assistant Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*